1   **BERNSTEIN LITOWITZ BERGER**
    **& GROSSMANN LLP**
2   JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
3   2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
4   Tel:    (310) 819-3470

5         -and-

6   JOHN RIZIO-HAMILTON
(johnr@blbglaw.com)
7   AVI JOSEFSON
(avi@blbglaw.com)
8   SCOTT R. FOGLIETTA
(scott.foglietta@blbglaw.com)
9   BRITTNEY N. BALSER
(brittney.balser@blbglaw.com)
10   1251 Avenue of the Americas
New York, NY 10020
11   Tel:    (212) 554-1400
Fax:    (212) 554-1444
12
*Attorneys for Plaintiff IBEW Local 353*
13   *Pension Plan*

14

15   **UNITED STATES DISTRICT COURT**

16   **NORTHERN DISTRICT OF CALIFORNIA**

17   IBEW LOCAL 353 PENSION PLAN, on
behalf of itself and all others similarly
18   situated,

        Case No. 3:21-cv-3396

19               Plaintiff,

**COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES**
20           v.
**LAWS**

21   FIBROGEN, INC., ENRIQUE CONTERNO,
JAMES A. SCHOENECK, and K. PEONY
22   YU,
<u>CLASS ACTION</u>

DEMAND FOR JURY TRIAL

23              Defendants.

24

25

26

27

28

Plaintiff IBEW Local 353 Pension Plan ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by FibroGen, Inc. ("FibroGen" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning FibroGen; and (d) other public information regarding the Company.

I.   **INTRODUCTION**

1.     This securities class action is brought on behalf of purchasers of FibroGen common stock between December 20, 2018 and April 6, 2021, inclusive (the "Class Period").  The claims asserted herein are alleged against FibroGen and certain of the Company's current and former senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     FibroGen operates a research-based pharmaceutical company based on the discovery, development, and commercialization of novel therapeutic agents to treat serious unmet medical needs.  The Company's most advanced product is Roxadustat, a treatment for anemia.  On December 20, 2018—the first day of the Class Period—FibroGen announced positive topline results from its Phase 3 trials of Roxadustat.  Specifically, FibroGen claimed that Roxadustat had "achieved superiority in efficacy not only against placebo but also over active comparator in our studies," Epogen.  Throughout the ensuing months, FibroGen touted the success of Roxadustat's Phase 3 trials, and the drug's preferable safety analysis figures as compared to the current standard of care drug.

3.     On May 9, 2019, FibroGen announced topline results from the pooled safety analyses from its Phase 3 trials of Roxadustat.  The Company highlighted positive Major Adverse Cardiac Events ("MACE") results from the Phase 3 trials, stating there was "no clinically meaningful difference in the risk of MACE" between Roxadustat and the current standard of care, Epogen, and that in some patients, there was a "trend toward reduced risk" of MACE.  However,

1   the Company did not include any actual data.  As a result of this disclosure, the Company's stock

2   price declined by $9.28 per share, or 20%.

3           4.     On December 23, 2019, FibroGen submitted to the U.S. Food and Drug

4   Administration (the "FDA") a New Drug Application ("NDA") seeking approval for the use of

5   Roxadustat in patients with chronic kidney disease.  Around the time of the NDA submission—

6   which incorporated the results of Roxadustat's Phase 3 trial—FibroGen stated that it was "very

7   comfortable with [the Roxadustat] data where it is now" and that the Company "had all the

8   guidance from the FDA [it] needed to put together a winning submission."  In reality, FibroGen

9   had manipulated the data from the Phase 3 study to make the drug appear safer and more effective

10  than the standard of care for the treatment of chronic kidney disease, Epogen.

11          5.     On March 1, 2021 after the market closed, FibroGen announced that the FDA was

12  scheduling an advisory committee meeting to review Roxadustat's NDA, well over a year after its

13  initial submission.  An advisory committee meeting this late in the review process indicates that

14  there is a problem with the application, and could, at best, delay the FDA's approval decision and

15  at worst signal that the FDA may not approve the drug.  As a result of this disclosure, the

16  Company's stock price declined by $12.46 per share, or 25%.

17          6.     Then, on April 6, 2021, after the market closed, FibroGen shocked investors when

18  it revealed that the Company had made "post-hoc changes to the stratification factors" in its

19  previously submitted Phase 3 trial results—material changes that made the drug appear to be a safe

20  and effective treatment for chronic kidney disease.  FibroGen also revealed that after correcting

21  the stratification changes, it could "no longer make the conclusion that we have a statistically

22  superior result" compared to Epogen in dialysis patients.  This disclosure caused the price of

23  FibroGen stock to decline another $14.90 per share, or 43%.

24  **II.**      **JURISDICTION AND VENUE**

25          7.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange

26  Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R.

27  § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28

28  U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

8.       Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  FibroGen maintains its corporate headquarters in San Francisco, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**III.   PARTIES**

9.       Plaintiff IBEW Local 353 Pension Plan is a Toronto-based pension fund that provides retirement benefits to union members in a wide variety of fields including utilities, construction, telecommunications, broadcasting, manufacturing, railroads, and government. Plaintiff purchased shares of FibroGen common stock on the public market during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

10.       Defendant FibroGen is a research-based pharmaceutical company.  Incorporated in Delaware, the Company maintains its corporate headquarters at 409 Illinois Street, San Francisco, California.  FibroGen stock trades on the NASDAQ, which is an efficient market, under ticker symbol "FGEN."  As of March 15, 2021, there were 91.6 million shares of FibroGen common stock outstanding, owned by at least hundreds or thousands of investors.

11.       Defendant Enrique Conterno ("Conterno") has served as the Chief Executive Officer of FibroGen since January 3, 2020, and is a member of the Company's Board of Directors.

12.       Defendant James A. Schoeneck ("Schoeneck") is the current Chairperson of the Board of Directors of FibroGen and has served on the Board of Directors of FibroGen since April 2010.  In addition, Defendant Schoeneck served as interim Chief Executive Officer of FibroGen from August 2019 until January 2020.

13.       Defendant K. Peony Yu ("Yu") served as Chief Medical Officer of FibroGen from April 2016 until December 2020.

14.     Defendants Conterno, Schoeneck, and Yu are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with FibroGen, possessed the power and authority to control the contents of FibroGen's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.   Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV.   BACKGROUND

15.     Based in San Francisco, California, FibroGen operates a research-based pharmaceutical company based on the discovery, development, and commercialization of novel therapeutic agents to treat serious unmet medical needs.

16.     FibroGen's most advanced product is Roxadustat, an oral treatment for anemia associated with chronic kidney disease.   The current standard of care drug for this condition, Epogen, is an injection that is only approved for use in severe chronic kidney disease patients who are already on dialysis.   Epogen has not been approved for use in non-dialysis patients because the increased risk of cardiac events outweighs the benefits of the drug in patients with less severe chronic kidney disease.

17.     FibroGen set out to create a drug that "could deliver the therapeutic benefits" of the existing standard of care drug, but "with the convenience of a pill."   FibroGen believed that an oral medication "has the potential to improve treatment access and patient compliance."   FibroGen also aimed to broaden the market opportunity for Roxadustat by demonstrating safe use by new-to-dialysis patients and non-dialysis patients.

18.     When considering the risk of cardiac events, a key safety endpoint scrutinized by the FDA is the MACE results from a drug's Phase 3 trials.   The lower the MACE result, the lower

the risk of cardiac events.  Therefore, a drug's MACE results are an important part of the overall risk benefit assessment the FDA performs when considering an NDA and can make the difference between a drug being approved or rejected.  This is particularly true when, as is the case here, an existing standard of care drug has already been approved.

19.     FibroGen and the FDA agreed that the primary safety endpoint for Roxadustat would be the drug's MACE hazard ratio.  A hazard ratio compares the length of time until a MACE for patients on Roxadustat to the length of time until a MACE for incidents in the control group. The smaller the hazard ratio, the longer the time until a MACE.  If a hazard ratio is below 1.0, a drug company can conclude that the drug is safer than the control group it is being compared to.

20.     To obtain FDA approval, it was critical for FibroGen to show Roxadustat is at least as safe as Epogen when taken by patients already on dialysis.  While not fully dispositive, Roxadustat's MACE hazard ration is a key factor in making the safety determinations necessary for FDA approval.  Therefore, the lower Roxadustat's MACE hazard ratio, the higher the likelihood of FDA approval.

## V.     FIBROGEN DEFRAUDS INVESTORS

21.     The Class Period begins on December 20, 2018, the day FibroGen issued a press release announcing positive topline results from its Phase 3 trials of Roxadustat.  In the press release, which was also filed with the SEC on Form 8-K, the Company reported it had "met all primary efficacy endpoints" for the Phase 3 trials of Roxadustat.  The press release also quoted then-CEO Thomas Neff touting the success of the Phase 3 trials, saying "[t]hese Phase 3 results demonstrate the potential for [R]oxadustat to be a first-in-class oral anemia therapeutic for [chronic kidney disease] patients."  The press release went on to quote Defendant Yu, who reported that FibroGen was "excited to have achieved superiority in efficacy not only against placebo but also over active comparator in our studies" and "[t]hese results support [R]oxadustat's potential to bring clinical benefit over current standard of care."

22.     On February 27, 2019, FibroGen held a conference call with analysts and investors to discuss the Company's earnings and operations for the fourth quarter of 2018.  During the conference call, then-CEO Thomas Neff stated that "[t]here is a rich and diverse set of extremely

interesting preliminary data emerging" from the Phase 3 trials of Roxadustat, and that "[a]t this point based on our review of the data . . . there is a strong conviction to move ahead to file the NDA . . . this year."  In addition, Defendant Yu discussed the preliminary safety data from the Phase 3 trials, stating that the "[r]esults in individual studies are consistent with what one would expect in the steady population" and that FibroGen was "encouraged by the robust efficacy results, the preliminary safety data in individual Phase 3 studies and the ongoing pool efficacy and safety analyses."

23.     On May 9, 2019, FibroGen disclosed topline results from the pooled safety analyses from its Phase 3 trials of Roxadustat, including MACE results.  In the press release, FibroGen stated that in dialysis patients, there was "no clinically meaningful difference in risk of MACE between [R]oxadustat" and the current standard of care Epogen.  FibroGen also announced that in the new-to dialysis subgroup of patients, there "is a trend toward reduced risk for patients on [R]oxadustat" compared to Epogen.  Lastly, FibroGen reported that, in non-dialysis patients, "we believe there is no clinically meaningful difference in risk of MACE between [R]oxadustat and placebo."  However, FibroGen did not include any actual data, nor did the Company explicitly state whether or not Roxadustat was non-inferior to comparators when it comes to MACE results.  The language used by FibroGen in the press release and the lack of corresponding data was the first indication that Roxadustat may not be as safe as the Company had indicated.  As a result of this disclosure, FibroGen shares fell $9.28 per share, or 20%.

24.     FibroGen assured investors that the confusion over the language in the press release was caused by the FDA, explaining to an industry analyst from Jefferies that the press release was worded the way it was because FibroGen and the FDA had not yet come to an agreement on the statistical definition for MACE.  Therefore, according to FibroGen, the Company could not say whether or not Roxadustat was statistically non-inferior until after the statistical upper and lower bounds were agreed upon by the FDA.  However, FibroGen reiterated that they felt "very confident about Roxa[dustat]'s numerically lower event profile."  Analysts' concerns were assuaged by FibroGen's explanation.  An industry analyst from Jefferies explained that, following discussions

with the Company, they had a "very clear picture" of the drug that investors will soon "realize the data is positive and Roxa[dustat]'s risk/benefit is favorable."

25.     On June 12, 2019, Defendant Yu represented FibroGen at the Goldman Sachs Global Health Care Conference.  During the conference, Defendant Yu again touted the Phase 3 trial results and the "compelling evidence confirming [R]oxadustat's cardiovascular safety to support our regulatory filings."  Defendant Yu again reiterated that FibroGen believed "our MACE results in dialysis and in non-dialysis also support the conclusion of no increased cardiovascular safety risk" and that Roxadustat "may give [FibroGen] the opportunity to improve and expand anemia care in the very large [chronic kidney disease] non-dialysis patient population."

26.     On August 8, 2019, FibroGen held a conference call with analysts and investors to discuss the Company's earnings and operations for the second quarter of 2019.  On that call, Defendant Yu stated that "Phase 3 results confirmed the cardiovascular safety of [R]oxadustat" and highlighted a "very good pre-NDA meeting with the FDA on [R]oxadustat" where FibroGen and the FDA reached an agreement "on our proposed pooled MACE analysis."  Defendant Yu stressed that they were moving as quickly as possible toward NDA submission, and that the Company was "targeting October of this year" for a finalized submission.

27.     In response to an analyst question on the August 8 conference call, Defendant Yu expressed FibroGen's "confidence on non-inferiority of MACE" stating that the Company's "level of confidence is very high, and we do believe . . . that our Phase 3 results confirm cardiovascular safety of [R]oxadustat in the [chronic kidney disease] population in both dialysis and non-dialysis."

28.     On November 8, 2019, FibroGen issued a press release announcing the full results from the pooled safety analyses from its Phase 3 trials of Roxadustat.  In the press release, which was also filed with the SEC on Form 8-K, FibroGen announced specific MACE hazard ratios, the primary safety endpoint agreed on with the FDA.  Specifically, the Company reported a MACE hazard ratio of 0.96 (95% confidence interval, 0.82 to 1.13) for dialysis patients, a MACE hazard ratio of 0.70 (95% confidence interval, 0.51 to 0.96) in the new-to-dialysis subsection of patients, and a MACE hazard ratio of 1.08 (95% confidence interval, 0.94 to 1.24) in non-dialysis patients.

29.     On November 11, 2019, FibroGen held a conference call with analysts and investors to discuss the Company's earnings and operations for the third quarter of 2019.  During that call, Defendant Schoeneck stated that FibroGen's studies of Roxadustat showed that "[R]oxadustat's cardiovascular safety was comparable to placebo in non-dialysis-dependent patients."  In addition, Defendant Schoeneck reiterated that Roxadustat did not increase the risk of cardiac events in dialysis patients as compared to Epogen.

30.     On the November 11 conference call, Defendant Yu explained that "[t]o evaluate the merits of [R]oxadustat, it is important to put together an overall picture taking into account efficacy and safety and ask if this drug has the potential to improve anemia treatment in [chronic kidney disease] patients.  Our answer is yes."  In addition, Defendant Yu stated that FibroGen had been having "a very productive dialogue with the FDA" on the cardiovascular safety analysis that would be needed for the Roxadustat NDA and that following the last meeting FibroGen "had all the guidance from the FDA [it] needed to put together a winning submission."  When asked by an analyst about potential concerns regarding MACE hazard ratios, Defendant Yu replied that FibroGen was "very comfortable with our data where it is now."

31.     On December 23, 2019, FibroGen submitted its NDA for Roxadustat to the FDA, which was based on the data and results obtained through Roxadustat's Phase 3 trial.

32.     On February 25, 2020, Defendant Conterno represented FibroGen at the SVB Leerink Global Healthcare Conference.  At the conference, Defendant Conterno was asked about the cardiovascular safety of Roxadustat.  In response, Defendant Conterno explained that "I've had a chance to conduct and be part of a number of cardiovascular studies in my previous role, and I believe that the data that we have on cardiovascular safety is very compelling."  Defendant Conterno went on to say that "when we look at the data, basically – we showed to be comparable to placebo" and that "the data [is] extremely clean from my perspective when it comes to cardiovascular safety."  Later during the conference, Defendant Conterno said he was "very excited and delighted with the result that we got in – out of cardiovascular safety" for Roxadustat.

33.     The statements and omissions set forth in ¶¶21-30, 32 were materially false and misleading.  In truth, FibroGen had made post-hoc changes to Roxadustat's Phase 3 trial results

that made the drug appear safer than it was.  When the data manipulation was corrected, FibroGen could "no longer make the conclusion that [Roxadustat] ha[s] statistically superior result[s]" when compared to Epogen.

## VI.    DISCLOSURES OF COMPANY'S MISCONDUCT CAUSE SIGNIFICANT INVESTOR LOSSES

34.    On March 1, 2021, FibroGen shocked investors by announcing that the FDA was scheduling an advisory committee meeting to review Roxadustat's NDA.  While an advisory committee review for a first-in-class drug is not itself always surprising, the timing of this meeting shocked investors.  An FDA advisory committee review so late in the process could indicate an issue with the submission, and casts doubt on the drug's approval, at least within the expected time frame.  That same day, Defendant Conterno represented FibroGen at the Cowen Health Care Conference.  While there, Defendant Conterno continued to assuage investor concerns about Roxadustat.  Specifically, Defendant Conterno stated that FibroGen "continue[d] to have confidence in the completeness of the NDA submission and the strength of the [R]oxadustat data" and that "[c]learly, the efficacy and safety of [R]oxadustat were established by the global Phase 3 programs."  Later that day, Defendant Conterno was quoted in an article saying that FibroGen "continue[d] to be confident in the efficacy and safety profile of this potential new medicine based on positive results from a global Phase 3 program."

35.    However, analysts continued to be troubled by the announcement of the FDA advisory committee meeting and what it could mean for Roxadustat's approval.  An analyst at Raymond James explained that the meeting indicates that "there is still significant risk to approval," while an analyst at SVB Leerink wrote "[t]his announcement, and the complete lack of clarity about its implications, significantly lowers our confidence in overall approval for Roxa[dustat] . . . particularly in the non-dialysis setting where the risk-benefit tradeoff may be less clear to regulators".  As a result of this disclosure, FibroGen shares fell $12.46 per share, or 25%, from $50.53 per share to $38.07 per share.

36.    Then, on April 6, 2021, after the market closed, the Company made the shocking admission that FibroGen had made post-hoc changes to Roxadustat's Phase 3 trial results that

made the drug appear safer than it was.  Specifically, these post-hoc stratification changes resulted in materially lower MACE safety endpoint figures, making it appear that Roxadustat was safer than it actually was.  In reality, the MACE safety endpoint figures were materially higher than the MACE figures FibroGen and the Defendants repeatedly touted throughout the Class Period, and the data could not, as FibroGen and Defendants had claimed, "support the conclusion of no increased cardiovascular safety risk" in patients using Roxadustat.

37.     Specifically, FibroGen reported a corrected MACE hazard ratio of 1.02 for dialysis dependent patients (95% confidence interval, 0.88 to 1.20), a MACE hazard ratio of 0.82 in the new-to-dialysis subsection of patients (95% confidence interval, 0.60 to 1.11), and a MACE hazard ratio of 1.10 in non-dialysis patients (95% confidence interval, 0.96 to 1.27).

38.     In connection with this disclosure, Defendant Conterno explained that after remedying the stratification changes, FibroGen could "no longer make the conclusion that we have a statistically superior result when it comes to MACE" compared to Epogen in new-to dialysis patients.  Not only had FibroGen incorrectly touted MACE safety figures for Roxadustat that were much lower than the original data actually showed, but the corrected figure was so much higher that FibroGen could no longer accurately claim that Roxadustat was safer than the current standard of care.

39.     As a result of this disclosure, the stock fell another $14.90 per share, or 43%, from $34.64 per share to $19.74 per share.

## VII.   LOSS CAUSATION

40.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of FibroGen stock and operated as a fraud or deceit on the Class (as defined below).  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on May 9, 2019, March 1, 2021, and April 6, 2021 the price of FibroGen stock fell.  As a result of their purchases of FibroGen common stock during the Class Period, Plaintiff and other members of the Class suffered losses, *i.e.*, damages, under the federal securities laws.

VIII.   **CLASS ACTION ALLEGATIONS**

41.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased FibroGen common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of FibroGen and their families and affiliates.

42.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. FibroGen has approximately 91.6 million shares of stock outstanding, owned by at least hundreds or thousands of investors.

43.     Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)     Whether Defendants' misconduct impacted the price of FibroGen common stock;

(f)     Whether Defendants' conduct caused the members of the Class to sustain harm; and

(g)     The extent of harm sustained by Class members and the appropriate measure of harm.

44.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained harm from Defendants' wrongful conduct.

45.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

46.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR

47.     FibroGen's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

48.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of FibroGen who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X.     PRESUMPTION OF RELIANCE

49.     At all relevant times, the market for FibroGen stock was an efficient market for the following reasons, among others:

(a)     FibroGen stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, FibroGen filed periodic public reports with the SEC and NASDAQ;

(c)     FibroGen regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

and

        (d)     FibroGen was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

50.    As a result of the foregoing, the market for FibroGen common stock promptly digested current information regarding FibroGen from all publicly available sources and reflected such information in the price of FibroGen common stock.  Under these circumstances, all purchasers of FibroGen common stock during the Class Period suffered similar injury through their purchase of FibroGen common stock at artificially inflated prices and the presumption of reliance applies.

51.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding material changes FibroGen made to Roxadustat's Phase 3 trial results that will impact the FDA's consideration of the NDA and significantly reduce the likelihood of approval—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Roxadustat, FibroGen's most advanced product, as set forth above, that requirement is satisfied here.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

52.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

53.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (b) cause economic harm to Plaintiff and other members of the Class.

54.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

55.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

56.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

57.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal FibroGen's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

58.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased FibroGen common stock and were harmed when the truth about FibroGen negatively impacted the price of those securities.  Plaintiff and the Class would not have purchased FibroGen common stock at the prices they paid, or at all, had they been aware of the truth about FibroGen.

59.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered harm in connection with their respective purchases of the Company's common stock during the Class Period.

60.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

61.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

62.     The Individual Defendants acted as controlling persons of FibroGen within the meaning of Section 20(a) of the Exchange Act.   By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about FibroGen, the Individual Defendants had the power and ability to control the actions of FibroGen and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensation to Plaintiff and other Class members against all Defendants, jointly and severally, for all harm sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XII.   JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 6, 2021                    Respectfully submitted,

                                      **BERNSTEIN LITOWITZ BERGER**
                                       **& GROSSMANN LLP**


                                      */s/ Jonathan D. Uslaner*
                                      JONATHAN D. USLANER (Bar No. 256898)
                                      (jonathanu@blbglaw.com)
                                      2121 Avenue of the Stars, Suite 2575
                                      Las Angeles, CA 90067
                                      Tel:    (310) 819-3470

                                                -and-

                                      JOHN RIZIO-HAMILTON
                                      (johnr@blbglaw.com)
                                      AVI JOSEFSON
                                      (avi@blbglaw.com)
                                      SCOTT R. FOGLIETTA
                                      (scott.foglietta@blbglaw.com)
                                      BRITTNEY N. BALSER
                                      (brittney.balser@blbglaw.com)
                                      1251 Avenue of the Americas
                                      New York, NY 10020
                                      Tel:    (212) 554-1400
                                      Fax:    (212) 554-1444

                                      *Counsel for Plaintiff IBEW Local 353 Pension Plan*

## CERTIFICATION PURSUANT TO
## <u>THE FEDERAL SECURITIES LAWS</u>

We, Lee Caprio and Dave Graham, on behalf of IBEW Local 353 Pension Plan ("Local 353"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. We are Trustees of Local 353.  We have reviewed the complaint and authorize its filing by counsel.

2. Local 353 did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Local 353 is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Local 353's transactions in the FibroGen, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Local 353 has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Reidinger v. Zendesk, Inc.*, No. 19-cv-06968 (N.D. Cal.)

6. Local 353 will not accept any payment for serving as a representative party on behalf of the Class beyond Local 353's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.


We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 6th day of May, 2021.


| | |
|---|---|
| Lee Caprio | Dave Graham |
| Trustee | Trustee |
| *IBEW Local 353 Pension Pan* | *IBEW Local 353 Pension Plan* |

**IBEW Local 353 Pension Plan**
**Transactions in FibroGen, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 7/12/2019 | 5,000 | 45.6000 |
| Purchase | 10/4/2019 | 859 | 36.0383 |
| Purchase | 11/8/2019 | 1,637 | 42.1978 |
| Purchase | 12/5/2019 | 368 | 47.0009 |
| Purchase | 1/13/2020 | 144 | 41.9129 |
| Purchase | 6/25/2020 | 1,714 | 42.5368 |
| Purchase | 6/26/2020 | 3,897 | 40.8747 |
| Purchase | 12/8/2020 | 416 | 41.7057 |
| | | | |
| Sale | 1/3/2020 | (409) | 43.5756 |
| Sale | 4/28/2020 | (260) | 40.6188 |
| Sale | 7/16/2020 | (580) | 44.8450 |
| Sale | 3/1/2021 | (374) | 50.1654 |